## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| James Cyrus, individually on behalf of himself and all others similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>PennyMac Loan Services, LLC<br><br>                              Defendant. | Case No. 3:24-cv-01145-JAM<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff James Cyrus (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant PennyMac Loan Services, LLC ("PennyMac" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which is based on personal knowledge.

### <u>NATURE OF THE ACTION</u>

1.     This is a putative class action lawsuit by Plaintiff and other military veterans who had their Veteran Affairs ("VA") backed mortgages serviced by PennyMac. Plaintiff and the putative class members entered into COVID-19 Forbearance Plans concerning their mortgages based on a false and deceptive promise by PennyMac that a deferred payment program would be available to them when their forbearance plans ended. The deceptively offered deferred payment program allowed forbore payments to be advanced through a non-interest-bearing subordinate lien, thereby bringing the primary mortgage loan current without modifying the pre-existing loan terms. The subordinate lien would then be required to be paid in full when the primary loan matured or

was otherwise satisfied.  However, Defendant stopped accepting applications for the deferred payment program without notifying Plaintiff and the putative class.  Ultimately, Defendant's deceptive behavior and unfair dealing forced Plaintiff and the other veteran class members into damaging mortgage loan modifications with materially higher interest rates, late charges, unnecessary closing costs and fees, and much higher monthly payments.  Indeed, in addition to the illegal late charges and closing costs, Plaintiff's mortgage payments increased by approximately $550 per month from his unlawfully obtained mortgage loan modification.

2.     Defendant engaged in a bait and switch scheme by initially offering the deferred mortgage payment program, but then Defendant stopped accepting applications for the deferred payment option without providing notice of that change to Plaintiff and the class members. Therefore, when their forbearance plans ended, Defendant forced Plaintiff and class Members to accept costly loan modification agreements which caused them economic distress and simultaneously, but unlawfully, increased the amount of money that Defendant made off each serviced loan.

3.     Defendant is one of the largest mortgage servicers in the United States.  Defendant is also a servicer of VA backed loans and currently services over 450,000 VA Loans on behalf of service members, veterans, and their families.

4.     PennyMac's profits from servicing loans are based on the spread between the servicing cost and the loan's interest.  Therefore, increasing the interest rate on a loan will increase the profits that PennyMac can make off that loan.

5.     In response to the COVID-19 pandemic, Congress passed the Coronavirus, Aid, Relief, and Economic Security Act in 2020 ("CARES Act" or "the Act").  Part of the Act sought

to protect borrowers of federally backed loans by requiring mortgage servicers to provide forbearance plans to those who faced economic distress due to the pandemic.

6. PennyMac reached out to its customers who had federally backed loans and offered to place them into COVID-19 Forbearance Plans. Forbearance is an important financial decision with potentially significant consequences. Forbearance allows the borrower to put off making payments on their mortgage for a period of time but does not waive these payments. Thus, when forbearance ends, borrowers must repay all the missed payments from the forbearance period.

7. When PennyMac offered COVID-19 Forbearance Plans to its customers, including Plaintiff, it promised that a deferred payment program was an available option to pay off the forbore payments. This deferred payment program would have allowed the loan to be brought current without modifying the existing loan terms.

8. Plaintiff accepted the forbearance offer based on Defendant's false and deceptive promise that the deferred payment program was an available option following his forbearance plan. Plaintiff reasonably expected the deferred payment option to be available to him throughout his forbearance and when his forbearance ended, such that he could enter into a deferred payment program that would take effect at the expiration of his forbearance.

9. PennyMac stopped accepting applications for the deferred payment program, but it never notified Plaintiff at any point that the program was set to expire and would no longer be available to him when his forbearance plan ended.

10. In every communication prior to the secreted expiration of the program, PennyMac promised that a deferred payment program would be an option to Plaintiff when he ended his forbearance. However, when Plaintiff ended his forbearance, he was informed that a deferred payment plan was no longer an option. Instead, he could only enter into an infeasible repayment

plan or modify his loan agreement at a significantly higher interest rate, or face foreclosure. Plaintiff had no choice but to accept a costly loan modification with an interest rate far above the one he paid before his forbearance, as well as late fees and unnecessary closing costs and expenses.

11.     Had Plaintiff known that the deferred payment program was ending, he would have elected to end his forbearance early and enter into the deferred payment program. PennyMac's failure to notify Plaintiff caused him to miss out on the deferred payment program and forced him to modify his loan at a higher interest rate.

12.     Instead of resuming payments at his pre-forbearance rate as he expected, the yearly interest rate and the monthly payments on his mortgage skyrocketed causing significant economic harm.

13.     PennyMac makes more money off their serviced loans when the interest rate on the loan is higher.  PennyMac, through this bait and switch, was able to convert Plaintiff's loan with an interest rate far below the current market rate to a loan in line with higher current market rates and thus reap the economic benefits of such an increase.

14.     PennyMac's scheme violates the Connecticut Unfair Trade Practices Act, C.G.S.A. §§ 42-110a, *et seq.,* breaches the covenant of good faith and fair dealing, unjustly enriches the Defendant, and violates the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605.

## THE PARTIES

15.     Plaintiff is a resident of Connecticut, residing in Waterbury, Connecticut.  Plaintiff is a Vietnam War military veteran and served in the U.S. Army First Cavalry Division as a helicopter pilot.  Plaintiff also has a service-connected disability with a 100% disability rating from the VA.

16.     On February 23, 2021, Plaintiff signed a mortgage agreement guaranteed by the VA.  The loan had a balance of $130,000, an interest rate of 2.65%, and was set to be paid off by March 1, 2051.  The Loan was serviced by PennyMac.

17.     In August 2021, Defendant offered a COVID-19 Forbearance Plan to Plaintiff and promised that a deferred payment program would be available when he exited his plan.

18.     Defendant did not notify Plaintiff before the end of his COVID-19 Forbearance Plan that it would no longer be accepting applications for the deferred payment program by the time Plaintiff's Forbearance Plan ended in July 2022.

19.     Defendant never called or made live contact with Plaintiff prior to the end of his Forbearance Plan to inform him of any repayment or loss-mitigation options available to him or those that would soon expire.

20.     When Plaintiff's COVID-19 Forbearance Plan ended in July 2022, he was not offered a deferred payment option and instead was unlawfully forced to accept a burdensome loan modification agreement that increased his loan interest rate from 2.65% to 6.875%.

21.     Had Plaintiff known that the deferred payment program would no longer have been available, he would have ended his COVID-19 Forbearance Plan to avoid a costly loan modification agreement and would have entered into the deferred payment program.

22.     Defendant PennyMac Loan Services, LLC is a Delaware corporation, with its principal place of business in Westlake Village, CA. Defendant services loans in the State of Connecticut and across the United States.  Defendant serviced VA backed loans during the class period and induced borrowers into costly loan modifications through deceitful and misleading business practices.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendant.

24.     The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in this State, and Plaintiff's claims arise out of Defendant's forum-related activities. Furthermore, a substantial portion of events giving rise to Plaintiff's claims occurred in this District.

25.     Venue is proper in this District because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL BACKGROUND

**A.     The CARES Act And Forbearance Requirements**

26.     The CARES Act was signed into law on March 27, 2020, in response to the economic crisis caused by the COVID-19 pandemic.

27.     The CARES Act is the largest economic stimulus bill in the United States' history and sought to support individuals and business affected by the COVID-19 pandemic.

28.      A primary focus of the CARES Act was to assist American homeowners with Federally backed mortgages who faced economic struggles due to the COVID-19 pandemic.

29.     The CARES ACT allowed homeowners with Federally backed mortgages to request a forbearance for 180 days with the option to extend the forbearance for another 180 days.

30.    So long as homeowners showed a financial hardship, servicers were obligated to provide the forbearance.

31.    Section 4022(b) of the Act provides, in relevant part, that:

A.  In general.  –

**During the covered period, a borrower with a Federally backed mortgage loan experiencing a financial hardship due, directly or indirectly, to the COVID-19 emergency may request forbearance on the Federally backed mortgage loan**, regardless of delinquency status, by—

(A) submitting a request to the borrower's servicer; and

(B) affirming that the borrower is experiencing a financial hardship during the COVID-19 emergency.

(2) Duration of forbearance.  –

**Upon a request by a borrower for forbearance under paragraph (1), such forbearance shall be granted for up to 180 days, and shall be extended for an additional period of up to 180 days at the request of the borrower**, provided that, at the borrower's request, either the initial or extended period of forbearance may be shortened.[1]

32.    Forbearance allows mortgage borrowers to pause their mortgage payments to servicers for a certain period.  Importantly, a forbearance does not waive the missed mortgage payments as the borrower must still repay all the forbore payments at some point following the forbearance.

33.    Forbearance is therefore an important financial decision with serious implications for borrowers.  Furthermore, many borrowers did not actually require forbearance.  A survey by

---

[1] Coronavirus Aid, Relief, and Economic Security Act, H. R. 748, 116th Cong. (2nd Sess. 2020), https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf (last visited June 20, 2024) (emphasis added).

LendingTree found that 70% of homeowners who have gone into forbearance did not need the relief.[2]

34.    Recognizing the importance of this decision to enter forbearance, Fannie Mae has issued guidance on the CARES Act that requires mortgage servicers to fully inform borrowers about the obligations and downsides of forbearance.[3]

35.    Furthermore, mortgage servicers are required to provide borrowers with workout options to pay off their forbore mortgage payments. These workout options include deferred payments plans and loan modifications.

36.    While borrowers cannot waive their forbore payments, they are also not required to pay their forbore payments as a lump sum when their forbearance ends and instead enter one of these workout options.

37.    Many federally-backed mortgage loan servicers offered deferment programs due to the COVID-19 pandemic to help lessen the burden of paying back the payments missed during forbearance.

38.    Beginning July 27, 2021, the VA established a deferred payment program, offered to borrowers by their loan servicers, that allowed borrowers to resume monthly mortgage payments at their pre-forbearance rate without modifying the pre-existing loan by allowing the forbore payments to be advanced through a non-interest-bearing subordinate lien.  This loan would only come due at the end of the first mortgage loan, after a refinance, or when the property was sold. Essentially, borrowers who entered forbearance could resume mortgage payments at the original

---

[2] Aly J. Yale, 70% Of Homeowners Seeking Mortgage Relief Don't Actually Need The Help, FORBES, (May 19, 2020, 4:34 PM EDT), https://www.forbes.com/sites/alyyale/2020/05/19/70-of-homeowners-seeking-mortgage-relief-dont-actually-need-the-help/?sh=b52a98052a54.
[3] *See Lender Letter (LL-2023-03)*, FANNIE MAE (updated Aug. 9, 2023), https://singlefamily.fanniemae.com/media/33711/display.

interest rate they were paying prior to forbearance without being responsible for the missed payments immediately following their forbearance.

**B.      Defendant Offers Plaintiff a Forbearance Plan and Promises Deferment Payment Option**

39.      In accordance with the CARES Act, PennyMac offered COVID-19 Forbearance Plans to its customers, including those who may not have needed the relief.

40.      Plaintiff signed his original mortgage agreement on February 23, 2021, at an interest rate of 2.65% for a term of 30 years.

41.      In the Summer of 2021, PennyMac called Plaintiff to encourage him to enter into a COVID-19 Forbearance Plan. Since Plaintiff's loan was backed by the VA, he qualified for the VA deferred payment program.  The PennyMac representative explained that when Plaintiff exited his forbearance plan, he would be eligible for the deferred payment program and thus would not immediately be responsible for the forbore payments.

42.      Plaintiff understood that if he entered a forbearance plan, he could resume making payments at the original pre-forbearance interest rate when his forbearance ended and have the missed payments be advanced through a non-interest-bearing subordinate lien.

43.      Consequently, in August of 2021 Plaintiff applied for a COVID-19 Forbearance Plan and was approved for a plan on August 19, 2021.

44.      In its August 19 approval letter, PennyMac informed Plaintiff that he would have multiple workout options to help make up the forbore payments.  These options included a loan modification and a deferred payment option.

45.      PennyMac gave Plaintiff three forbearance extensions between August 19, 2021, and July 31, 2022.  In each letter extending the forbearance plan, PennyMac informed Plaintiff

that deferred payments would be a workout option for him to pay off the payments missed during the forbearance period.

46.    On July 18, 2022, PennyMac sent Plaintiff a letter informing him that his forbearance plan had reached the maximum time frame allowed by the owner or insurer of the loan and that his forbearance was set to expire on July 31, 2022, meaning that Plaintiff would have to resume making loan payments.

47.    At the same time, PennyMac was aware that it would stop accepting applications for the deferred payment program in August 2022, as the VA was set to sunset the program in October 2022.

48.    Therefore, both Plaintiff's forbearance and the deferred payment option, which he was promised and which he expected to apply for, were both set to expire at the same time.

49.    In the July 18 letter PennyMac provided three programs that were available to Plaintiff to pay off the forbore payments: a repayment plan, a loan modification, and a deferred payment option.  At the time of this letter, the VA was still offering the deferred payment option and Plaintiff was still eligible for the option.  However, nowhere in this letter did PennyMac inform Plaintiff that the deferred payment program was set to expire in less than a month and that he should apply before this expiration date.

50.    PennyMac stopped accepting applications for the VA deferred payment program in August 2022.  PennyMac never informed Plaintiff or any other COVID-19 Forbearance Plan participant that this program was ending.  Furthermore, PennyMac never informed them that failing to apply for this program before its expiration would mean that they could no longer choose the deferred payment option as a workout program, despite this option being available in the initial forbearance offer and in every subsequent correspondence.

51.    PennyMac was required by RESPA Regulation X, 12 C.F.R. § 1024.39, to make live contact with Plaintiff between 45 and 10 days prior to his COVID-19 Forbearance Plan ending to inform him of his repayment and loss-mitigation options, including the fact that the VA's deferred payment program was expiring and PennyMac would not be accepting applications for it by August 2022.

52.    PennyMac, however, never called or made live contact with Plaintiff prior to his COVID-19 Forbearance Plan ending to inform him of any repayment or loss-mitigation options that were available to him or those that would soon expire, including the VA's deferred payment program.  Nor did PennyMac call Plaintiff, as required by Regulation X, to inform him of any actions he needed take in order to benefit from specific repayment plans, such as ending his forbearance plan before PennyMac stopped accepting applications for the deferred payment program.

53.    Had Plaintiff been informed that the deferred payment program was ending, as PennyMac was required to under Regulation X, he would have immediately ended his forbearance and entered into the deferred payment program.

C.    **Defendant Forced Plaintiff To Accept A Burdensome Loan Modification Because Of Its Deceitful Activities**

54.    Throughout his forbearance plan, Plaintiff had monthly check-in calls with PennyMac where PennyMac would confirm that Plaintiff was still in his house.  In none of these calls, did PennyMac mention the upcoming expiration of the deferred payment option.  In the call that occurred the month prior to Plaintiff's Forbearance Plan ending, PennyMac did not inform Plaintiff of the repayment or loss mitigation options that were available or those that would soon expire.  PennyMac did not inform Plaintiff that if he wanted to participate in the deferred payment

program, he would have to end his Forbearance Plan before its mandatory expiration and apply for the program before August 2022.

55.    On August 4, 2022 Plaintiff had a monthly check-in call and informed PennyMac that he was willing to resume monthly payments.  PennyMac did not give Plaintiff the option to apply for the deferred payment option even though the VA was still operating the program. Instead, PennyMac told Plaintiff that he had to get current on his forbore payments.

56.    Plaintiff could not afford to repay all the forbore payments without a deferred payment program.  Therefore, PennyMac offered Plaintiff a choice: enter into an infeasible repayment plan, accept a damaging loan modification agreement or face foreclosure. Plaintiff had no choice but to accept a loan modification agreement.

57.    Prior to and throughout his forbearance Plaintiff had an interest rate of 2.65% on his mortgage loan.  PennyMac offered Plaintiff an interest rate of 6.875% for his loan modification representing a roughly 243% increase on his interest rate. Plaintiff's mortgage payments increased to $955.48 per month to $1,437.11 per month.  Such an increase is a tremendous economic burden for Plaintiff.

58.    In addition to the materially higher interest rates, Defendant also charged Plaintiff late fees and unnecessary closing costs associated with the loan modification.

59.    These interest rate increases and the related fees conferred a significant economic benefit for Defendant. When PennyMac services loans that it owns, it profits through spread which is the difference between interest payments made on the loans and the cost to service the loan.  By forcing plaintiff into a loan modification with a significantly higher interest rate, Defendant stood to make more money off the loan.

60.    In March of 2023, Plaintiff was approved for a VA Streamline Disaster Modification with a Trial Payment Plan at an interest rate of 6.875%.  Upon completion of the trial payment plan, Plaintiff sent signed final documents and began making mortgage payments under the new modified loan agreement.

61.    Had Plaintiff known that such a drastic loan modification was a possibility he would have ended his forbearance before the deferred payment program expired and would have entered into to the deferred payment program.

62.    But for PennyMac's representations from their initial phone call and all subsequent letters about a deferred payment option, Plaintiff would not have risked being forced into such a burdensome modification to his mortgage payments.  PennyMac engaged in a bait and switch by luring Plaintiff into a forbearance with the promise of a deferred payment option then switching the deferred payment option for a costly loan modification when the forbearance ended because of their failure to notify Plaintiff that the deferred payment program was expiring.

63.    This bait and switch scheme by Defendant caused substantial present and future financial harm to Plaintiff.

## CLASS ACTION ALLEGATIONS

64.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

65.    Plaintiff seeks to represent a class defined as all people in the United States who had their VA backed mortgages serviced by PennyMac and entered into COVID-19 Forbearance Plans with a deferred payment program option, but were not notified by PennyMac that the deferred payment program option expired and who agreed to mortgage loan modifications following their forbearance plans (the "Class").  Specifically excluded from the Class is Defendant,

Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

66.     Plaintiff also seeks to represent a subclass consisting of Class Members in Connecticut (the "Connecticut Subclass" or "Subclass").

67.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class and Subclass may be expanded or narrowed by amendment or amended complaint.

68.     **Numerosity.**   Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.   On information and belief, Members of the Class and Subclass number in the tens of thousands.   The precise number of Class and Subclass Members and their identities are unknown to Plaintiff at this time but will be determined through discovery. Class and Subclass Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

69.     **Commonality.**  Common questions of law and fact exist as to all Members of the Class and Subclass and predominate over any questions affecting only individual Class or Subclass Members.  These common legal and factual questions include, but are not limited to, the following:

    (a) Whether Defendant made false and/or misleading statements to its borrowers concerning the availability of payment options following forbearance plans;

    (b) Whether Defendant omitted material information to its borrowers concerning the termination of the deferred payment program;

(c) Whether Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to concealing that the deferred payment program was ending;

(d) Whether Defendant's representations concerning the forbearance plans were likely to deceive a reasonable consumer;

(e) Whether Defendant represented to consumers that options would be available despite knowledge that it may not be;

(f) Whether Defendant offered forbearance plans with enticing deferred payment options to lure borrowers with low mortgage rates into higher, more expensive loans;

(g) Whether Defendant failed to provide borrowers in COVID-19 related forbearance plans with timely and accurate information regarding their repayment and loss mitigation options through live contact as required by Regulation X;

(h) Whether Defendant made and breached its contract with plaintiff including the covenant of good faith and fair dealing by making misrepresentations to Plaintiff, Class, and Subclass Members;

(i) Whether Defendant's representations, omissions, and/or breaches caused injury to Plaintiff, Class, and Subclass Members; and

(j) Whether Plaintiff, Class, and Subclass Members are entitled to damages.

70.    **Typicality.**  Plaintiff's claims are typical of the claims of the other Members of the Class and Subclass in that, among other things, all Class and Subclass Members were deceived (or reasonably likely to be deceived) in the same way by Defendant's false and misleading claims about payment options following forbearance plans.  All Class and Subclass Members were comparably injured by Defendant's wrongful conduct as set forth herein.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

71.    **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the Members of the Class and Subclass.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf

of the Class and Subclass.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class and Subclass.

72.    **Predominance.**  Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class and Subclass issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading mortgage service practices.

73.    **Superiority.**  Class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class and Subclass Members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for Class and Subclass Members to obtain effective redress on an individual basis for the wrongs committed against them.  Even if Class and Subclass Members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  It would also increase the delay and expense to all parties and the court system from the issues raised by this action.  The class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

74.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Connecticut Unfair Trade Practices Act,
### C.G.S.A. §§ 42-110a, *et seq.*

### (On Behalf Of The Connecticut Subclass)

75.     Plaintiff hereby incorporate by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

76.     Plaintiff James Cyrus brings this claim individually and on behalf of the Members of the proposed Connecticut Subclass against Defendant.

77.     Defendant engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of Connecticut Unfair Trade Practices Act, C.G.S.A. §§ 42-110a, *et seq.*, including inducing Plaintiff into a mortgage forbearance with a bait and switch by promising a deferred payment option then failing to notify Plaintiff that the promised deferment option was set to expire thereby forcing him into an expensive loan modification.

78.     Defendant's representations and omissions were material because they violated consumers' reasonable expectations.  Defendant knew consumers would agree to a mortgage forbearance under the false – but reasonable – belief that a deferred payment program would be available to them when they exited forbearance.  Reaching out to consumers to inform them of the forbearance plans with the option of deferred payments and subsequently assuring consumers in all communications that deferment will be available upon the termination of the forbearance, proves that information about deferment payment options is material to consumers.  If such information were not material, Defendant would not have mentioned it in their call to consumers to offer forbearance plans and in all subsequent letters related to these plans.  As a result of their deceptive acts and practices, Defendant has signed up thousands of homeowners for forbearance

17

plans across Connecticut. If Defendant had not concealed that the deferred payment option was set to expire, Plaintiff and other Connecticut Subclass Members would have ended their forbearance plan, entered into deferred payment programs, and would not have been forced to accept burdensome, expensive loan modification agreements.

79.     Defendant acted intentionally, knowingly, and maliciously to violate the Connecticut Unfair Trade Practices Act, and recklessly disregarded Plaintiff and Connecticut Subclass Members' rights.

80.     As a direct and proximate result of Defendant's deceptive and unlawful acts and practices, Plaintiff and other Members of the Class have suffered ascertainable loss of money or property, and monetary and non-monetary damages, including time and expenses relating to rearranging their finances to adjust to higher mortgage payments.

81.     Defendant's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the thousands of Defendant's Connecticut-based customers.

82.     The above deceptive and unlawful practices and acts by Defendant caused substantial injury to Plaintiff and Connecticut Subclass Members that they could not reasonably avoid.

83.     Plaintiff and Connecticut Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages and equitable relief, including injunctive relief.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Breach of Contract Including the Covenant of Good Faith and Fair Dealing**
**(On Behalf Of The Class and Connecticut Subclass)**

84.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

85.     Plaintiff and all members of the proposed Class and Subclass contracted with PennyMac for their mortgage services.  When PennyMac offered a COVID-19 Forbearance Plan to Plaintiff and Class and Subclass Members, they promised that a deferred payment option would be available to them when they exited forbearance.

86.     PennyMac breached promises made to Plaintiff and all members of the proposed Class and Subclass when, as described herein, PennyMac did not notify borrowers in a COVID-19 Forbearance Plan that the deferred payment program, which PennyMac said would be available upon completion of the plan, would be expiring at the same time borrower's plans were set to end.

87.     In addition, there exists an implied covenant of good faith and fair dealing in all contracts that neither party shall do anything which will have the effect of destroying or injuring the right of the party to receive the fruits of the contract.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

88.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference or failure to cooperate in the other party's performance.

89.     The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts, limits the parties' conduct when their contract defers a decision.

90.    Defendant acted in bad faith by failing to notify Plaintiff and Class and Subclass Members that the deferred payment program was ending and subsequently forcing them into loan modifications.  This bait and switch evaded the spirit of the bargain and violated the obligation of good faith in performance.

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**
**(On Behalf Of The Class and Connecticut Subclass)**

91.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

92.    Plaintiff brings this claim individually and on behalf of the Members of the proposed Class and Subclass.

93.    Plaintiff and Class and Subclass Members conferred a benefit on Defendant by agreeing to new loan modification agreements with higher interest rates following their COVID-19 Forbearance Plans.  PennyMac makes more money on loans with higher interest rates. Therefore, by not informing Plaintiff and Class and Subclass Members that the deferred payment option was ending, Defendant unlawfully enriched itself by then forcing Plaintiff and Class and Subclass Members into high interest rate loan modification agreement.

94.    Defendant also unlawfully enriched itself by collecting late fees and unnecessary closing costs and expenses related to the loan modification from Plaintiff.

95.    When Plaintiff and Class and Subclass Members' COVID-19 Forbearance Plans ended, Defendant forced Plaintiff and the Class to decide between paying their missed payments in full, entering a costly loan modification, or foreclosing their house.  Such a decision forced Plaintiff and Class and Subclass Members to accept the loan modification agreement.

96.    Such a modification brought higher interest rates for Plaintiff, whose rate for example increased from 2.65% to 6.875%, and all other Class and Subclass Members.

97.    These higher interest rates allow PennyMac to profit more off these loans that were previously unfavorable to them.

98.    When PennyMac services loans, it profits through spread which is the difference between interest payments made on the loans and the cost to service the loan.

99.    By entering the COVID-19 Forbearance Plan, Plaintiff and class Members were ultimately forced into loan modifications with significantly higher interest rates and were not able to enter the promised deferred payment option. Therefore, Plaintiff and Class and Subclass Members conferred a financial benefit on Defendant but did not receive their expected benefit therefrom.

100.    It is unjust and inequitable for the Defendant to retain these benefits because they were attained by misrepresenting and fraudulently concealing the true facts of the post-forbearance plan repayment program from Plaintiff and Class and Subclass Members, who would not have entered the COVID-19 Forbearance Plan or would have left them earlier, but for Defendant's misrepresentations and omissions.

101.    Equity cannot in good conscience permit Defendant to retain the benefits derived from Plaintiff and Class and Subclass Members through its unjust and unlawful acts, and therefore restitution or disgorgement of the amount if their unjust enrichment is required.

## FOURTH CLAIM FOR RELIEF

### Violation of the Real Estate Settlement Procedures Act ("RESPA")

### 12 U.S.C. § 2605

### (On Behalf Of The Class and Connecticut Subclass)

102.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations

contained in all preceding paragraphs of this complaint.

103.     Plaintiff brings this claim individually and on behalf of the Members of the

proposed class and subclass.

104.     Defendant has violated the Real Estate Settlement Procedures Act ("RESPA"), 12

U.S.C. § 2605(k)(1)(E), "[s]ervicer prohibitions," which states that "[s] servicer of a federally

related mortgage shall not fail to comply with any other obligation found by the Bureau of

Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer

protection purposes of this chapter."

105.     Regulation X, 12 C.F.R. § 1024, is a regulation promulgated by the Bureau of

Consumer Financial Protection pursuant to RESPA, 12 U.S.C. § 2605.

106.     Regulation X's "Temporary COVID-19-related live contact" rule, states that:

> If the borrower is in a forbearance program made available to
> borrowers experiencing a COVID-19 related hardship, during the
> live contact established pursuant to paragraph (a) of this section that
> occurs **at least 10 days** and **no more than 45 days before** the
> scheduled end of the forbearance program … the servicer shall
> inform the borrower of the following information:
>> (i) The date the borrower's current forbearance program is
>> scheduled to end;
>> (ii) A list and brief description of each of the types of
>> forbearance extension, repayment options, and other loss
>> mitigation options made available to the borrower by the
>> owner or assignee of the borrower's mortgage loan at the
>> time of the live contact, and the actions the borrower must
>> take to be evaluated for such loss mitigation options; and

> (iii) At least one way that the borrower can find contact information for homeownership counseling services, such as referencing the borrower's periodic statement.

12 C.F.R. § 1024.39(e)(2) (emphasis added).

107.    Defendant failed to provide Plaintiff and Class Members in COVID-19 related forbearance programs with accurate and timely information on repayment and loss mitigation options through live contact.

108.    When Plaintiff's and Class Members' forbearance plans were set to expire, Defendant did not attempt to or engage in live contact, only sending letters stating certain workout options would be available.

109.    Defendant did not provide Plaintiff and Class Members with the required information on how to be evaluated for certain repayment and loss mitigation options.

110.    As a direct and proximate result of Defendant's violation of Regulation X, Plaintiff and other Members of the Class have suffered ascertainable loss of money or property, and monetary and non-monetary damages, including the increase in mortgage payments and fees paid in connection with the loan modifications.

111.    RESPA provides a private right of action against a servicer that "fails to comply with any provision of this section." 12 U.S.C. § 2605(f). And under RESPA PennyMac is required to comply with Regulation X. 12 U.S.C. § 2605(k)(1)(E) ("A servicer of a federally related mortgage shall not … fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."). By failing to comply with Regulation X, Defendant violated RESPA and is liable for all damages incurred by Plaintiff and Class Members as a result.

112.    Accordingly, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth by the statute, 12 U.S.C. § 2605(f), including actual damages, additional

damages of $2,000 for each violation, reasonable attorneys' fees and other litigation costs reasonably incurred, and such other equitable relief as the court determines to be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, seeks judgment against Defendant as follows:

(a) Certifying the nationwide Class and the Connecticut Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass Members;

(b) Declaring that Defendant's conduct violates the statutes referenced herein;

(c) Finding in favor of Plaintiff, the Class, and Connecticut Subclass against Defendant on all counts asserted herein;

(d) Ordering Defendant to disgorge and make restitution of all monies Defendant acquired by means of the unlawful practices as set forth herein;

(e) Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its conduct and pay them all the money they are required to pay;

(f) Awarding actual damages and additional damages of $2,000 for each of Defendant's violations, pursuant to 12 U.S.C. § 2605(f);

(g) Awarding Plaintiff and Class and Subclass Members their costs and expenses incurred in the action, including reasonable attorneys' fees and costs;

(h) Ordering Defendant to pay pre-judgment interest on all amounts awarded; and

(i) Providing such further relief as may be just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: October 25, 2024                    Respectfully submitted,

**REARDON SCANLON LLP**

By: */s/ James J. Reardon, Jr.*
      James J. Reardon, Jr.

James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone:  (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 100019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com

*Counsel for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2024, a true and correct copy of the foregoing

was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: October 28, 2024                    /s/ James J. Reardon, Jr.
                                           James J. Reardon, Jr.