## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES CYRUS,
    *Plaintiff*,

v.

PENNYMAC LOAN SERVICES,
    *Defendant.*

No. 3:24-cv-01145-(VAB)

## RULING AND ORDER ON MOTION TO DISMISS

James Cyrus ("Plaintiff") has filed a putative class action against PennyMac Loan Services, LLC ("PennyMac" or "Defendant"), alleging violations of the Connecticut Unfair Trade Practices Act ("CUTPA") and the Real Estate Settlement Procedures Act ("RESPA"), breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Am. Compl., ECF No. 42 (Oct. 28, 2024) ("Am. Compl.").

PennyMac has moved to dismiss the Amended Complaint. Mot. to Dismiss, ECF No. 43 (Nov. 18, 2024); Mem. of L. in Supp. of Mot. to Dismiss, ECF No. 44 (Nov. 18, 2024) ("Mem.").

For the reasons explained below, PennyMac's motion to dismiss is **GRANTED** in part and **DENIED** in part.

The motion is granted as to the RESPA claim, and that claim will be dismissed.

The motion is denied as to the other claims, CUTPA, the implied covenant of good faith and fair dealing claim, and unjust enrichment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

Mr. Cyrus is a Connecticut resident and veteran who, in February 2021, obtained a

mortgage loan guaranteed by the U.S. Department of Veterans Affairs ("VA") in the principal

amount of $130,000. Am. Compl. ¶ 16. PennyMac is the servicer of Cyrus's loan. *Id.*; Mem. at 4.

In August 2021, Mr. Cyrus entered into a COVID-19 forbearance plan with PennyMac

under the CARES Act, which allowed him to suspend his mortgage payments. Am. Compl. ¶ 43;

Mem. at 4. Before he enrolled, Mr. Cyrus alleges that a PennyMac representative called him and

assured him that when the plan ended, he would be eligible for a deferred payment program

allowing him to resume his regular payments at his prior interest rate while deferring missed

installments through a non-interest-bearing lien. Am. Compl. ¶¶ 41–42.

Mr. Cyrus further alleges that PennyMac confirmed this arrangement in writing, stating in

an August 19, 2021 approval letter that "multiple workout options" would be available at the

conclusion of his forbearance, including a deferred payment option. *Id.* ¶ 44. He extended the

forbearance three times, through July 2022, and alleges that each extension letter repeated that

deferred payments would be available. *Id.* ¶ 45.

Mr. Cyrus alleges that PennyMac knew the VA planned to sunset its deferred payment

program by the summer of 2022 but did not inform him. *Id.* ¶ 47. He contends that PennyMac's

silence deprived him of the opportunity to apply before the program expired. *Id.* ¶ 47.

When Mr. Cyrus's forbearance expired in July 2022, he alleges that PennyMac refused to

offer him the deferred payment option and instead required him either to repay the arrears in a

lump sum, enter an infeasible repayment plan, or accept a loan modification. *Id.* ¶¶ 55–56. Mr.

Cyrus claims that he had no realistic choice but to agree to a modification, which raised his

interest rate from 2.65% to 6.875%, increased his monthly payment from $955.48 to $1,437.11, and imposed additional late fees and closing costs. *Id.* ¶¶ 57–58. He characterizes this arrangement as a "bait-and-switch" that financially benefitted PennyMac at his expense. *Id.* ¶¶ 59, 63.

Mr. Cyrus also alleges that PennyMac violated RESPA by failing to establish "live contact" with him before the forbearance ended, as required by 12 C.F.R. § 1024.39(e). *Id.* ¶¶ 19, 52, 54. He contends that this omission prevented him from learning of the deferred payment program's expiration and forced him into a more costly modification, resulting in higher monthly payments, late fees, and closing costs. *Id.* ¶¶ 56–58; Mem. in Opp'n to Mem. to Dismiss 21-24, ECF No. 46 ("Opp'n").

### B.  PROCEDURAL HISTORY

On July 3, 2024, Mr. Cyrus filed the initial Complaint with claims under CUTPA, as well as for breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Compl., ECF No. 1.

On September 19, 2024, PennyMac moved to dismiss this Complaint. Mot. to Dismiss, ECF No. 32; Mem. in Supp., ECF No. 33.

On October 28, 2024, the Court granted Mr. Cyrus leave to amend and denied the motion to dismiss the initial Complaint as moot. Order, ECF No. 41.

On October 28, 2024, Mr. Cyrus filed the First Amended Class Action Complaint, which, in addition to all of the previous claims, added a claim under RESPA. Am. Compl., ECF No. 42.

On November 18, 2024, PennyMac moved to dismiss the First Amended Complaint in its entirety. Mem, ECF No. 44.

On December 9, 2024, Mr. Cyrus opposed the motion. Opp'n, ECF No. 46.

On December 23, 2024, PennyMac filed its reply. Reply Mem. in Supp. of Mot. to Dismiss, ECF No. 49 ("Reply").

On January 17, 2025, the case was reassigned to this Court, following the tragic passing of U.S. District Judge Jeffrey Alker Meyer. ECF No. 56.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss under 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the

plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *See also York v. Ass'n of the Bar of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy

judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

## III.    DISCUSSION

Mr. Cyrus alleges that PennyMac's conduct violated CUTPA, breached the implied covenant of good faith and fair dealing, unjustly enriched PennyMac, and also violated RESPA.

The Court will address each of these claims in turn.

### A. The CUPTA Claim

CUTPA provides that "[n]o person shall engage in … unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). It further allows "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of" such conduct to sue for actual damages, punitive damages, and equitable relief. *Id.* § 42-110g(a).

To determine unfairness, Connecticut courts apply the Federal Trade Commission's "cigarette rule." *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007). The factors are "(1) whether the practice … offends public policy …; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119–20 (2d Cir. 2004) (quotation marks omitted). "All three criteria do not need to be satisfied to support a finding of unfairness." *Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 994 A.2d 153, 173 (Conn. 2010). *See Bartold v. Wells Fargo Bank, N.A.*, No. 3:14-cv-00865 (VAB), 2015 WL 7458504, at *5–6 (D. Conn. Nov. 24, 2015) (quoting Conn. Gen. Stat. §§ 42-110b(a), 42-110g(a); applying the FTC "cigarette rule," citing *Aztec Energy*, *Fabri*, and *Harris*).

6

A plaintiff may plead "deception," a subset of unfairness, by alleging that: "(1) the defendant made a representation, omission, or other practice likely to mislead consumers; (2) the plaintiff, a consumer, interpreted the message reasonably under the circumstances; and (3) the misleading representation, omission, or practice must be have been likely to affect the plaintiff's decisions or conduct." *See Smith v. Wells Fargo Bank*, N.A., 158 F. Supp. 3d 91, 101 (D. Conn.), aff'd, 666 F. App'x 84 (2d Cir. 2016). Courts have recognized that misrepresentations by mortgage servicers can be actionable under either framework. *See Bartold v. Wells Fargo Bank, N.A.*, No. 3:14-cv-00865 (VAB), 2015 WL 7458504, at *5–6 (D. Conn. Nov. 24, 2015).

### i. Misrepresentation and Deception

PennyMac argues that Mr. Cyrus's CUTPA claim must be dismissed because the Amended Complaint fails to allege either a deceptive or unfair practice or a legally cognizable loss caused by PennyMac. Mem. at 8–13; Reply at 4–7.

First, PennyMac argues that Mr. Cyrus cannot plausibly allege any unfair or deceptive acts or practices. Mem. at 9–10. PennyMac maintains that the loan servicing letters Mr. Cyrus relies on foreclose his allegations of deception. Those letters, PennyMac points out, disclosed only that Mr. Cyrus "may" qualify for certain programs depending on his circumstances and the requirements of the "owner or insurer" of his loan. Mem. at 10.

By including such qualifications, PennyMac contends, the letters "neutralize[d] any deception," and show no "immoral, unethical, oppressive, or unscrupulous" conduct. Mem. at 9–11. PennyMac argues that the letters confirm that no binding promise was ever made. Reply at 5–6.

Mr. Cyrus argues that the Amended Complaint plausibly alleges a deceptive and unfair "bait-and-switch" in violation of CUTPA. Am. Compl. ¶ 77.

He pleads that PennyMac induced him (and similarly situated borrowers) to enter COVID-19 forbearance by repeatedly assuring—both in calls and letters—that a deferred payment option would be available when forbearance ended, but later failed to disclose that the option would expire before his forbearance concluded, leaving costly modification as the only path. *Id.* at ¶¶ 7–10, 41–43, 47–50, 77–78.

On deception, Mr. Cyrus alleges that a PennyMac representative told him he "would be eligible for the deferred payment program" upon exiting forbearance and that PennyMac's communications "promised" that option throughout the forbearance period, even as its availability was nearing an end. Opp'n. at 5–11; Am. Compl. ¶¶ 41–43, 47–50. He argues that, in context, generic "may qualify" caveats do not defeat the plausibility of deception where the servicer repeatedly reinforced availability yet failed to disclose imminent discontinuation— particularly to borrowers whose forbearance would extend past the program's sunset. Opp'n. at 10–11.

On unfairness and public policy, Mr. Cyrus argues that PennyMac's alleged conduct— promising borrowers access to a deferred payment program during COVID-19 forbearances, then secretly allowing that program to expire and forcing costly loan modifications without notice— involved violations of RESPA and the federal CARES Act, thereby supplying the public-policy predicate for CUTPA. Opp'n. at 6–7. In his view, in the context of the pandemic, the scheme was "immoral, unethical, oppressive, or unscrupulous." *Id.* at 5; Am. Compl. ¶¶ 77–82.

The Court agrees.

On the issue of misrepresentation, Mr. Cyrus's allegations are sufficient to survive a motion to dismiss. At this stage, the Court must accept as true his claim that PennyMac repeatedly represented—both through letters and through a conversation with a company

8

representative—that he "would be eligible for the deferred payment program" when his forbearance ended. Am. Compl. ¶¶ 41–43, 47–50. While PennyMac argues that its letters used qualifying language such as "may be eligible" and identified program eligibility as depending on the loan's investor or insurer, those disclaimers do not necessarily foreclose a claim of deception. As the Second Circuit has observed, "[t]he presence of a disclaimer or certain clarifying language may defeat a claim of deception," but it does not automatically do so if the plaintiff plausibly alleges that the overall communication still created a misleading impression." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013).

Here, Mr. Cyrus plausibly alleges all three elements of deception. First, PennyMac allegedly made repeated representations and omissions likely to mislead by affirmatively suggesting the deferred payment program would be available, while failing to disclose its impending expiration. Am. Compl. ¶¶ 9–10, 42–43, 47–50. Second, Mr. Cyrus alleges that he reasonably interpreted those messages to mean that he could resume his mortgage payments at his pre-forbearance rate upon exiting forbearance. *Id.* ¶¶ 41–43. Third, those representations were material to his decision to enter and remain in forbearance, ultimately leading him to accept a costly loan modification at a higher interest rate. *Id.* ¶¶ 8–10, 18–20.

Moreover, Connecticut courts have sustained CUTPA claims where mortgage servicers misled or confused borrowers about loan modifications or repayment programs. In *Cenatiempo v. Bank of Am., N.A.*, the court held that RESPA-related misrepresentations by a servicer could be deemed "immoral, unethical, oppressive, or unscrupulous." 219 A.3d 767, 787 (Conn. 2019). Likewise, in *Tanasi v. CitiMortgage, Inc.*, this Court held that deceptive solicitations for mortgage modifications sufficed to state a CUTPA claim. 257 F. Supp. 3d 232, 274–75 (D. Conn. 2017).

At the pleading stage, the Court does not weigh competing interpretations of PennyMac's letters, but instead determines whether Mr. Cyrus plausibly alleges deception. And he has.

Accordingly, Defendant's motion to dismiss will be denied as it relates to Mr. Cyrus's misrepresentation and deception theory under CUTPA.

### ii.  Duty to Disclose

Mr. Cyrus also argues that PennyMac's failure to inform him of the expiration of the VA deferred payment program constitutes a deceptive omission under CUTPA. He emphasizes that Regulation X imposed a duty on servicers during the COVID-19 emergency to make live contact with borrowers at least 10 to 45 days before the end of a forbearance plan to inform them of (i) the date the plan was ending, and (ii) the available repayment and loss mitigation options. Am. Compl. ¶¶ 51–53. Mr. Cyrus argues that PennyMac's silence in the face of this regulatory requirement was misleading and material, because borrowers—such as himself—remained in forbearance unaware that the deferred payment program was no longer available. By concealing that expiration, Mr. Cyrus alleges that PennyMac induced borrowers into expensive loan modifications at higher interest rates. *Id.* ¶¶ 9–10, 18–20. In his view, this nondisclosure was not only deceptive under CUTPA but also a violation of federal public policy, reinforcing the unfairness of PennyMac's conduct.

The Court agrees.

At the motion to dismiss stage, Mr. Cyrus has plausibly alleged that PennyMac owed him a duty to disclose the expiration of the VA deferred payment program, and, under CUTPA, a "failure to disclose can be deceptive only if, in light of all the circumstances, there is a duty to disclose." *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 100 (2d Cir. 2019). Such a duty may arise not only from contractual or common-law obligations, but also from statutes and

regulations that define baseline standards of disclosure in the mortgage-servicing context. *See Cenatiempo*, 219 A.3d at 787 (alleged violations of RESPA supported CUTPA claim because conduct could be "immoral, unethical, oppressive, or unscrupulous").

Under Regulation X, servicers had to provide borrowers in COVID-19 forbearance programs with live contact information regarding the end date of their forbearance and the loss mitigation options then available. Accepting Mr. Cyrus's allegations as true, PennyMac failed to make the required live contact and withheld information about the termination of the deferred payment program, thereby preventing him from pursuing it. Am. Compl. ¶¶ 9–10, 51–53. At this stage, those allegations suffice to establish that PennyMac had an obligation to disclose material information.

While PennyMac relies on disclaimers in its letters, disclaimers may only defeat a misrepresentation theory where they "neutralize any deception." *Zito v. United Techs. Corp.*, No 3:15-cv-744 (AWT), 2016 WL 2946157, at *4–5 (D. Conn. Mar. 11, 2016). Here, Mr. Cyrus plausibly alleges that the communications continued to promise availability of the deferred payment program even as PennyMac failed to disclose that the program would expire. A reasonable consumer could have interpreted PennyMac's communications as assurances of availability, making nondisclosure of the program's cancellation misleading in context. *See Smith v. Wells Fargo Bank*, 158 F. Supp. 3d at 101 (recognizing that a deceptive practice under CUTPA can be plead based on an alleged "representation, omission, or other practice likely to mislead consumers . . . . a consumer, interpreted the message reasonably under the circumstances . . . and . . . the misleading representation, omission, or practice must have been likely to affect the [consumer's] decisions or conduct.").

Although PennyMac argues that not every silence constitutes deception under CUTPA, Mr. Cyrus has alleged more than mere silence. His allegations are sufficient to connect PennyMac's nondisclosure under Regulation X to affirmative communications that could reasonably be construed as misleading. At the pleading stage, these allegations are sufficient to allow this CUTPA claim to proceed. *See, e.g., Tanasi*, 257 F. Supp. 3d at 275 (sustaining CUTPA claims, where borrower was alleged to be "reckless and deceptive in their solicitation of mortgage modification agreements, causing additional costs, fees, and frustration for consumers" because "confusing and deceptive communications with vulnerable borrowers violated an important public policy.").

Accordingly, Defendant's motion to dismiss will be denied as it relates to Plaintiff's duty to disclose theory under CUTPA.

### iii.  Ascertainable Loss and Proximate Cause

To state a CUTPA claim, a plaintiff must allege that the defendant's acts were not merely a "but for" cause, but the proximate cause of the alleged loss. *Abrahams v. Young & Rubicam, Inc.*, 692 A.2d 709, 712 (Conn. 1997); *Lewis v. Assurant, Inc.*, 2022 WL 4599038, at *9 (D. Conn. Sept. 30, 2022). Under this standard, the prohibited conduct must have created a "foreseeable risk" that the plaintiff would be harmed in the manner alleged. *Abrahams*, 692 A.2d at 712.

PennyMac argues that Mr. Cyrus cannot show ascertainable loss proximately caused by its conduct and his alleged harm. Mem. at 13–15; Reply at 7. PennyMac argues that it was the VA—not PennyMac—that discontinued the deferred payment program. Am. Compl. ¶ 47, and that Mr. Cyrus himself extended his forbearance three times until the maximum duration allowed by the VA, *id.* ¶¶ 45–46. Nor, PennyMac argues, can it be held responsible for rising interest

12

rates at the time of modification, which were a function of Federal Reserve policy and broader economic conditions. *See* Mem. at 14–15. On this view, any connection between PennyMac's conduct and Cyrus's higher monthly payments is "too attenuated" to meet CUTPA's proximate cause requirement.

Mr. Cyrus argues that he has adequately pled both ascertainable loss and proximate cause under CUTPA. He relies on the principle that, at the pleading stage, it is enough that "the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act." *Sticht v. Wells Fargo Bank, N.A.*, No. 3:20-cv-1550 (VAB), 2022 WL 267470, at *5 (D. Conn. Jan. 28, 2022). He alleges that PennyMac's repeated assurances about the availability of the VA deferred payment program, coupled with its failure to disclose that the program was expiring, left him unable to apply for that option. Am Compl. ¶¶ 11, 21. As a result, when his forbearance ended, his only option was a costly loan modification. *Id.* He argues that it was foreseeable that PennyMac's failure to notify him of the program's expiration "would, at a minimum, result in increased expenses." *Sticht*, 2022 WL 267470, at *5.

Mr. Cyrus alleges direct, measurable financial losses: his monthly mortgage payment rose from $955.48 to $1,437.11—a nearly $500 increase—after his interest rate jumped from 2.65% to 6.875%. Am.Compl. ¶ 57. He also alleges that he paid additional fees and costs in connection with the modification. *Id.* ¶¶ 1, 10, 57. More generally, he pleads that "as a direct and proximate result of Defendant's deceptive and unlawful acts," he and the class suffered ascertainable losses, including increased payments, fees, and the time and expense of rearranging their finances to accommodate higher mortgage obligations. *Id.* ¶¶ 80, 110.

The Court agrees.

At the pleading stage, proximate cause under CUTPA requires only that "the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act." *Sticht*, 2022 WL 267470, at *5 (quotation omitted). Mr. Cyrus alleges that PennyMac's repeated assurances regarding the deferred payment program, combined with its failure to disclose the program's imminent expiration, foreseeably caused him to miss the opportunity to apply for that program and instead enter a loan modification at a substantially higher rate and with additional fees. Am. Compl. ¶¶ 1, 10, 57, 80, 110. Those allegations plausibly connect PennyMac's conduct to the precise type of injury alleged—increased mortgage expenses—which courts in this District have recognized as sufficient to establish ascertainable loss and causation. *See Johnson v. JPMorgan Chase Bank, N.A.*, No. 3:17-CV-1995 (VLB), 2019 WL 1403396, at *5 (D. Conn. Mar. 28, 2019) ("Although Plaintiff had use and the ability to invest the mortgage payments she was unable to make, she has ostensibly alleged an ascertainable loss flowing from Defendant's delay in investigating her request for more information about her mortgage.") (citations omitted); *Tanasi*, 257 F. Supp. 3d at 276–77 ("The Tanasis have alleged that they incurred an ascertainable loss in the form of professional fees in attempting to apply for a mortgage modification, attorney's fees, postage, copying, and other miscellaneous expenses. These claims are sufficient to state a CUTPA claim) (citation and internal quotation marks omitted).[1]

As a result, Plaintiff has adequately pled proximate cause and ascertainable loss.

---

[1] PennyMac's reliance on *Abrahams v. Young & Rubicam, Inc.*, A.2d 709 (Conn. 1997) is misplaced. This case stands for the principle that mere "but-for" causation is insufficient and that remote or speculative harms cannot sustain a CUTPA claim. *See Abrahams*, A.2d 709 at 712 ("It is true that the plaintiff would not have been harmed but for the existence of the bribery scheme. ... mere 'but for' causation is not sufficient to support a CUTPA claim."). Here, however, Cyrus does not allege a remote chain of causation; he alleges a direct and foreseeable consequence of PennyMac's conduct: loss of access to the deferred payment program and the incurring of higher costs as a result.

Accordingly, for all of the reasons stated above, PennyMac's motion to dismiss Cyrus's CUTPA clam will be denied.

### B. The Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

To state a claim for breach of contract under Connecticut law, a plaintiff must plead the formation of an agreement, performance by one party, breach of that agreement by the other, and damages. *CCT Commc'ns, Inc. v. Zone Telcom, Inc.*, 172 A.3d 1228, 1240 (Conn. 2017).

Cyrus argues that his allegations satisfy all three elements of a claim for breach of the implied covenant of good faith and fair dealing under Connecticut law. First, he was in contractual privity with PennyMac through both his mortgage servicing agreement and the COVID-19 forbearance plan. Am. Compl. ¶¶ 16, 40, 43, 85; Opp'n at 15–16. These contracts created reasonable expectations that he would have access to the deferred payment program once forbearance ended.

Second, in his view, PennyMac's conduct injured his contractual rights. According to Mr. Cyrus, PennyMac repeatedly promised that a deferred payment program would be available, but then withdrew the program without disclosure. Am. Compl. ¶¶ 41, 49–50, 86; Opp'n at 16–17. When forbearance ended, the only remaining option was an expensive loan modification at a higher interest rate. This alleged "bait and switch scheme" deprived Cyrus of the benefits he reasonably expected. Am. Compl. ¶¶ 2, 13, 62–63.

Third, Cyrus alleges that PennyMac acted in bad faith. He alleges that PennyMac deliberately withheld notice of the program's expiration, at a time when rising rates increased PennyMac's own financial incentives to force borrowers into loan modifications. Am. Compl. ¶¶ 9–10, 13, 50, 58–59, 77, 90; Opp'n at 17–18. By profiting from higher interest payments, late

fees, and closing costs, PennyMac allegedly "evaded the spirit of the bargain" and engaged in subterfuge that the covenant forbids. Am. Compl. ¶¶ 87–90.

PennyMac argues that this claim fails as a matter of law for two independent reasons: the absence of a contract and the absence of bad faith.

First, PennyMac argues that Mr. Cyrus has not alleged the formation of a valid contract between him and PennyMac, much less identified any provision that PennyMac breached. Mem. at 15; Reply at 8. Even after amending his pleadings, PennyMac contends that Mr. Cyrus only asserts in general terms that "Plaintiff and all members of the proposed Class and Subclass contracted with PennyMac for their mortgage services." Am. Compl. ¶ 85; Mem. at 15. That bare assertion, PennyMac contends, is insufficient. Mem. at 15.

PennyMac argues that neither the mortgage deed nor the assumption rider imposes any duty to disclose the expiration of the VA's deferred payment program. Reply at 8.  And although Cyrus references his forbearance plan, the letters documenting that plan also contain no such obligation. *Id.* To the extent that Mr. Cyrus relies on alleged oral promises that a deferred payment option would be available, PennyMac argues that those claims are barred by the statute of frauds, Conn. Gen. Stat. § 52-550, because agreements concerning real property or loans exceeding $50,000 must be in writing. *Id.*

Second, PennyMac argues that Mr. Cyrus's implied covenant claim fails because he cannot plausibly allege "bad faith" to support it. Reply at 9. PennyMac argues that Mr. Cyrus's allegations—that it sought to profit by withholding notice of the VA program's expiration— amount to nothing more than disagreement with economic outcomes beyond PennyMac's control. Mem. at 16–17. Specifically, PennyMac notes that it had no control over (1) the VA's

16

decision to sunset the deferred payment program, or (2) prevailing interest rates at the time of modification, which were determined by broader economic conditions. *Id.*

To the extent that Cyrus argues that PennyMac acted in bad faith "conveniently after interest rates went up," Opp'n at 18, PennyMac argues that such allegations do not meet the standard for bad faith, because they lack any factual basis to infer "a dishonest purpose or sinister motive." Reply at 9.

The Court disagrees.

In essence, Mr. Cyrus alleges that he contracted with PennyMac through his mortgage agreement, mortgage assignment, and subsequent forbearance plan, and that PennyMac's conduct during the forbearance period frustrated his ability to access the deferred payment program and instead forced him into a costlier loan modification. Am. Compl. ¶¶ 41, 43, 84–90. While Mr. Cyrus does not point to a discrete term in the deed, assumption rider, or forbearance letters imposing on PennyMac an obligation to disclose the expiration of the VA's deferred payment program, a claim for breach of the implied covenant of good faith and fair dealing does not require that precise identification; it "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004).

Here, Mr. Cyrus alleges that PennyMac's communications during the forbearance period—including repeated assurances that a deferred payment option would be available upon exit—created a reasonable expectation that he would receive that benefit. Am. Compl. ¶¶ 41–45, 85. He further alleges that PennyMac deliberately failed to disclose the program's expiration and used that silence to funnel borrowers into higher-interest modifications from which PennyMac

stood to profit. *Id.* ¶¶ 50, 58–59, 90. Taking these allegations as true, they are sufficient to plead that PennyMac acted in a manner that "injure[d] the right of the other to receive the benefits of the agreement." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 237 (Conn. 2016).

While PennyMac argues that any increased mortgage cost was caused by external factors—namely, the VA's decision to sunset the deferred payment program and broader market interest rates—not by its own conduct, Mem. at 16–17; Reply at 8–9, under Connecticut law, bad faith may consist of "evasion of the spirit of the bargain, willful rendering of imperfect performance, [or] abuse of a power to specify terms." Am. Compl. ¶ 88; *see Whelan v. Brestelli*, 331 A.3d 1220, 1236 (Conn. App. Ct. 2025). (reiterating that "[e]very contract imposes upon each party a duty of good faith and fair dealing" and that a breach requires acts taken in bad faith, which "may be overt or may consist of inaction, and … may include evasion of the spirit of the bargain"); *LPP Mortg. Ltd. v. Underwood Towers Ltd. P'ship*, 259 A.3d 521, 564 (Conn. App. Ct. 2021) ("The notion of bad faith encompasses a wide range of dishonest behavior, including evasion of the spirit of the bargain.") (citations omitted); *Brennan Assocs. v. OBGYN Specialty Grp., P.C.*, 15 A.3d 1094, 1103 (Conn. App. Ct. 2011) ("[B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain....").

Mr. Cyrus does not allege that PennyMac controlled interest rates or federal policy. Instead, he claims that PennyMac knew of the VA program's imminent expiration yet chose not to disclose that fact, despite having affirmatively spoken about the program's availability. Am. Compl. ¶¶ 41–49. Read favorably to Mr. Cyrus, as this Court must, those allegations describe conduct sufficient to support an implied covenant claim. *See Habetz v. Condon*, 618 A.2d 501, 505 (Conn. 1992) ("Every contract carries an implied covenant of good faith and fair dealing

requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement.").

As a result, Mr. Cyrus has plausibly stated a claim that PennyMac violated the implied covenant of good faith and fair dealing by misleading him about the availability of loan-assistance options and thereby frustrating his contractual rights, and whether PennyMac acted in bad faith or was simply constrained by external factors is a factual question better resolved at the summary judgment, at the earliest.

Accordingly, PennyMac's motion to dismiss Cyrus's breach of the implied covenant of good faith and fair dealing claim will be denied.

### C. The Unjust Enrichment Claim

To state a claim for unjust enrichment under Connecticut law, a plaintiff must plausibly allege that (1) the defendant was benefited, (2) the defendant unjustly did not pay for the benefit, and (3) the failure of payment was to the plaintiff's detriment. *Michel v. Yale Univ.*, 547 F. Supp. 3d 179, 192 (D. Conn. 2021). The doctrine is "broad and flexible" and allows recovery "[W]herever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract…" *Town of New Hartford v. Connecticut Res. Recovery Auth.*, 970 A.2d 592, 609 (Conn. 2009).

Mr. Cyrus alleges that PennyMac was unjustly enriched when, after inducing him and others into COVID-19 forbearance plans, it failed to disclose the expiration of the VA deferred payment program and then forced borrowers into loan modifications carrying higher interest rates and additional fees. Am. Compl. ¶¶ 93–101. Those modifications increased Mr. Cyrus's monthly mortgage payment from $955.48 to $1,437.11 and generated additional revenue for PennyMac in the form of spread profits, late fees, and closing costs. *Id.* ¶¶ 57, 94, 96, 98. Mr.

Cyrus maintains that equity cannot permit PennyMac to retain these gains because they were secured through misrepresentation and concealment, depriving borrowers of the deferred payment option and leaving them financially worse off.  Am. Compl. ¶¶ 1–2, 7–14, 59, 63; Opp'n at 18–19.

Mr. Cyrus also argues that the "broad and flexible remedy" of unjust enrichment should be available because PennyMac profited from higher-rate modifications, gave borrowers no equivalent benefit in return, and the outcome was increased mortgage costs, fees, and economic harm. Am. Compl. ¶¶ 57–59, 63; Opp'n at 18–19.

Mr. Cyrus further argues that PennyMac's contention that because he "received some benefit" from the loan modification, his claim fails. Opp'n at 20. He argues that although he received a loan modification, it was defective because it was premised on deception and carried costs far higher than what he reasonably expected had the deferred payment program been available. Opp'n at 20; Am. Compl. ¶¶ 10–12, 57–58.

PennyMac argues that the unjust enrichment claim fails as a matter of law, and that Mr. Cyrus cannot meet any of its elements. Mem. at 17–19; Reply at 9–10.

PennyMac contends that unjust enrichment fails because Cyrus conferred no cognizable benefit: a higher-rate modification does not establish enrichment, especially given his two-year payment pause, voluntary choice to extend forbearance, and rising market rates. Mem. at 17–19.

PennyMac further argues that the deferred payment option was expressly conditional and never guaranteed, with forbearance correspondence making clear that modification was always a possible outcome. Mem. at 17–19; Reply at 9–10.  PennyMac also emphasizes that Cyrus actually received substantial benefits—a lengthy forbearance and a modification that avoided foreclosure—so his allegations reduce to generalized grievances about modification terms. Mem.

at 17–19; Reply at 9–10.  Finally, PennyMac reiterates that the disclosures foreclose Cyrus's theory, since the forbearance letters conditioned eligibility for deferment and nothing in the pleadings suggests the modification exceeded market terms or was improper. Reply at 9–10.

The Court disagrees.

Mr. Cyrus alleges that PennyMac affirmatively induced him to enter a COVID-19 forbearance plan while repeatedly assuring him that a deferred payment program would be available at its conclusion. Am. Compl. ¶¶ 10, 93–99. He further alleges that PennyMac concealed the program's expiration, thereby leaving him with no option but to accept a modification at a much higher interest rate, along with fees and closing costs. *Id.* ¶¶ 94–96, 100–01. These allegations are sufficient to plead that PennyMac derived a financial benefit from higher interest payments and fees, and that it did so at Cyrus's expense. *See, e.g. Clinger v. Edgewell Pers. Care Brands, LLC*, No. 3:21-cv-1040 (JAM), 2023 WL 2477499, at *15 (D. Conn. Mar. 13, 2023)  (rejecting argument that plaintiffs received the "benefit of their bargain" where the product purchased was defective and therefore worth less than what was paid).

At this stage, it would be premature to credit PennyMac's assertions that Mr. Cyrus benefitted from the forbearance and modification in ways that negate unjust enrichment. The issue of whether the modification was "defective," because it was obtained through allegedly misleading assurances, is better addressed following discovery and at the summary judgment stage, at the earliest. *See, e.g., Ramapo Land Co. v. Consol. Rail Corp.*, 918 F. Supp. 123, 128–29 (S.D.N.Y. 1996) (denying summary judgment on unjust enrichment where "a jury could reasonably conclude that plaintiff induced Conrail by misrepresentation to pay … and was thereby unjustly enriched").

As a result, viewing the allegations in the light most favorable to Mr. Cyrus, he has

plausibly alleged that PennyMac was unjustly enriched by profiting from loan modifications that

borrowers would not have entered absent its alleged misrepresentations and omissions.

Accordingly, PennyMac's motion to dismiss Mr. Cyrus's unjust enrichment claim will be

denied.

### D.  The RESPA Claim

RESPA provides a private right of action for violations of 12 U.S.C. § 2605 and 12

U.S.C. § 2605(f), but Regulation X does not itself create independent private causes of action.

*Gresham v. Wells Fargo Bank, N.A.,* 642 F. App'x 355, 359 (5th Cir. 2016) ("Unlike Section

1024.41, Section 1024.39 does not explicitly convey a private right of action to borrowers.");

*Miller v. HSBC Bank U.S.A.*, *N.A.*, No. 13 CIV. 7500, 2015 WL 585589, at *11 (S.D.N.Y. Feb.

11, 2015) (holding that § 1024.35, and by incorporation alleged violations of § 1024.39, "does

not provide a private right of action for damages"); *Brown v. Bank of N.Y. Mellon*, No. 1:16-cv-

194(LMB/IDD), 2016 WL 2726645, at *2 (E.D. Va. May 9, 2016) (dismissing § 1024.39 claim

because the regulation "does not explicitly provide a cause of action to private individuals").

That provision, promulgated by the Bureau of Consumer Financial Protection, requires mortgage

servicers to engage in live contact with borrowers in COVID-19 forbearance programs at least

ten days and no more than forty-five days before the program's scheduled expiration, and to

provide specific information, including the program's end date, available repayment and loss-

mitigation options, and contact information for homeownership counseling services. 12 C.F.R.

§ 1024.39(e)(2).

Mr. Cyrus alleges that PennyMac failed to comply with this requirement by never

engaging in the requisite live contact and by withholding accurate and timely information about

the expiration of the VA's deferred payment program and the steps necessary to apply for it. Am. Compl. ¶¶ 107–09. Instead, PennyMac sent letters generally referencing workout options while omitting the program's impending sunset, thereby leaving Mr. Cyrus with no meaningful opportunity to benefit from it. *Id.* He further alleges that this violation caused him actual damages in the form of higher monthly mortgage payments, fees, and related expenses after he was forced into a loan modification. *Id.* ¶ 110.

Mr. Cyrus argues that RESPA creates a private right of action enforceable through §§ 2605(k)(1)(E) and 2605(f), that borrowers in COVID-19 forbearance are deemed delinquent under CFPB commentary and thus within § 1024.39(e)(2), giving PennyMac a duty to provide live contact and disclosures before forbearance ended, and that PennyMac's failure to do so proximately caused him to miss the deferred payment program and suffer higher payments and fees. Opp'n 21–24; Am. Compl. ¶¶ 11, 21, 57–59, 63; 86 Fed. Reg. 34,863.

PennyMac argues that the RESPA claim fails on three independent grounds. First, there is no private right of action under § 1024.39(e), since unlike § 1024.41—which expressly incorporates § 2605(f)—§ 1024.39 contains no such language, and CFPB's rulemaking commentary reinforces that point. Mem. 19-25; Reply 1–4. Second, PennyMac contends that § 1024.39(e)(2) applies only to "delinquent" borrowers, and Cyrus never alleged he was delinquent during forbearance; CFPB commentary likewise clarifies that if a borrower is current at exit, the live-contact requirement does not apply. Mem. 19-25; Reply 1–4 (86 Fed. Reg. 34,863). Third, PennyMac asserts that Cyrus has not pleaded actual damages proximately caused by a violation, because he discussed workout options, the VA—not PennyMac—terminated the deferred payment program, and higher rates were caused by market conditions, leaving no plausible "but for" link between his alleged losses and the live-contact obligation. Mem. 19–25; Reply 1–4.

The Court agrees, in part.

Courts within and outside this Circuit have consistently held that Section 1024.39 does not confer a private right of action, in contrast to Section 1024.41, which expressly does. *See Gresham*, 642 F. App'x at 359; *Brown v. Bank of N.Y. Mellon*, 2016 WL 2726645, at \*2; *Williford v. Bayview Loan Servicing, LLC*, 1:16-CV-4268-ELR-LTW, 2017 WL 11151639, at \*7 (N.D. Ga. July 14, 2017). The Bureau's commentary accompanying the COVID-19 amendments likewise emphasized borrowers' enforcement rights under Section 1024.41 but made no such reference to Section 1024.39. 86 Fed. Reg. 34,848, 34,854 (June 30, 2021). Where the CFPB knew how to create a private right of action but declined to do so, this Court cannot imply one. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Statutory intent on this [] point is determinative . . . . Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.") (citations omitted).

Even if Section 1024.39(e) could be enforced privately, Mr. Cyrus's claim fails for an additional reason. The provision by its terms applies only to "delinquent borrowers." 12 C.F.R. § 1024.39(a). Regulation X defines "delinquency" as the date a payment "becomes due and unpaid." *Id.* § 1024.31. Cyrus alleges that, after PennyMac encouraged him to enroll in a COVID-19 forbearance plan and represented that a deferred-payment option would be available at exit, he entered forbearance, Am. Compl. ¶¶41–45, and he does not allege that his payments were "due and unpaid" during the forbearance period. The CFPB's commentary confirms that if a borrower is current when forbearance ends, Section 1024.39(e)(2) does not apply. 86 Fed. Reg. at 34,863 ("If the borrower was current at the time the forbearance was scheduled to end, § 1024.39(e)(2), as revised, would not apply because § 1024.39(a) would not apply."). Courts have

dismissed claims on this basis where plaintiffs, like Cyrus, failed to allege delinquency. *See Fisher v. Bank of N.Y. Mellon*, NO. 4:21-CV-8-DMB-JMV, 2021 WL 4449987, at *3 (N.D. Miss. Sept. 28, 2021) (dismissing Section 1024.39 claim where plaintiffs failed to "allege any facts related to when initial default occurred"). As a result, RESPA does not provide a basis for Mr. Cyrus's claim here.[2]

Accordingly, PennyMac's motion to dismiss Cyrus's RESPA claim will be granted, and that claim will be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, ECF No. 43, is **GRANTED IN PART and DENIED IN PART**.

The motion is granted as to the RESPA claim, and that claim will be dismissed.

The motion is denied as to the other claims, CUTPA, the implied covenant of good faith and fair dealing claim, and unjust enrichment.

SO ORDERED at New Haven, Connecticut, this 30th day of September, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[2] Because the Court will dismiss Cyrus's RESPA on other grounds, the Court does not and need not reach PennyMac's third argument—that Cyrus cannot show actual damages proximately caused by the alleged violation—does not provide an independent ground for dismissal at this stage.